## SAARI v. SILVERS.

1. COVENANTS—CONSTRUCTION OF RESTRICTIONS.

Generally, restrictions on the use of land will be construed strictly against those claiming to enforce them and all doubts resolved in favor of the free use of the property.

2. SAME—BURDEN OF PROOF OF RESTRICTIONS.

The burden of establishing restrictions on the use of land rests upon the party seeking to enforce the same.

3. SAME—GENERAL PLAN.

Where there is no express restriction in the chain of title of a particular lot, the use of which is sought to be restricted, there must be proof of a ''scheme of restrictions'' originating from a common owner and such general plan must have been maintained from its inception and understood, accepted, relied on, and acted upon by all in interest.

4. SAME—SUBSEQUENTLY—ADOPTED GENERAL PLAN.

A general plan of restriction upon the use of lots in a subdivision cannot arise and fasten upon one lot by reason of other lot owners subsequently conforming to such general plan where owner of lot first sold was not a party of record to the general plan.

5. SAME—RECIPROCAL NEGATIVE EASEMENTS—SUBDIVIDER'S VERBAL ASSURANCES.

Verbal assurances by subdivider to some lot buyers to exclude colored people from the use and occupancy of lot sold did not create a reciprocal negative easement as to such use since it did not impose such restriction upon the lot sold.

6. SAME—RACIAL RESTRICTIONS—EVIDENCE—NOTICE.

In suit to restrain defendants' occupancy of a house in a subdivision because of a claimed racial restriction, record held, void of any evidence that defendants' predecessors in title recognized in their conveyances any race restrictions or entered into any agreement regarding the same of which defendants had actual or constructive notice.

Definition of a negative easement, see 5 Restatement, Property, § 452.

7. Same—General Plan—Nonparticipants with Antedating Rights.

Restrictions resting in parol as to certain lots in a subdivision under a general plan, developed and consistently maintained, do not apply to previously-acquired titles not so restrained, held by nonparticipants and their grantees who are strangers to the plan with antedating rights.

Appeal from Wayne; Brennan (John V.), J. Submitted September. 24, 1947. (Docket No. 75, Calendar No. 43,661.) Decided January 5, 1948.

Bill by Wanger Saari and others against Silas Silvers and others to enforce alleged use restrictions. Decree for plaintiffs. Defendants Marshall appeal. Reversed.

*John W. L. Hicks*, for plaintiffs.

*Willis M. Graves* and *Francis M. Dent*, for defendants.

Sharpe, J. This is a suit in chancery to restrain the occupancy of a house located on lot No. 487 in the Robert Oakman's 12th Street Subdivision in the city of Detroit because of a claimed racial restriction.

Plaintiffs Saari and wife and Ambrose Roehrick and wife are property owners in the subdivision. They are of the Caucasian race and on October 12, 1942, filed a bill of complaint in the Wayne circuit court in chancery to enforce the claimed restriction. Later, an additional bill of complaint was filed by the Robert Oakman 12th Street Civic Association asking for similar relief.

Defendants Joel Marshall and Rosie Marshall are purchasers of the vendees' interest in a land contract for lot No. 487 in the subdivision. The Metropoli-

tan Life Insurance Company is the title owner of lot No. 487. Silas Silvers and Gladys Silvers, his wife, purchased the above lot from the Metropolitan Life Insurance Company on a land contract June 13, 1942, and on August 12, 1942, assigned their vendees' interest in the contract to Marshall and wife.

The record shows that the subdivision consists of 1,000 lots. The plat was recorded in 1916 and contains no restrictions. It is now built up and is a substantial area. The defendants Marshall are the only colored people who have ever lived in the subdivision. There is testimony that when these lots were put upon the market by Mr. Oakman, salesmen were instructed that no sales were to be made to persons other than of the Caucasian race; that Mr. Oakman reserved the right to pass upon the purchasers; that a number of offers to purchase by colored persons were made and rejected; that contracts issued by Mr. Oakman from 1916 to the early 1920's contained building restrictions, but no race restriction provision; that 512 deeds, each covering one or more lots in the subdivision, from Robert Oakman, the common grantor, contained no race restriction and that deeds from the common grantor covering five lots contain the mentioned restriction. There is also testimony of purchasers of lots in this subdivision prior to 1924 that they understood the property in this subdivision was restricted as to the Caucasian race; and that this assurance was a part of the consideration of purchase.

The cause came on for trial and the court found that the subdivision was subject to a common plan relative to the alleged race restriction; that the purchasers of lots had knowledge of such plan; that one of the reasons and inducements for such purchase was that the subdivision was subject to such restriction; and that the Marshalls are of the colored race

and had actual notice of the restriction at the time of purchase of lot No. 487. The trial court held that defendants' right of ownership was not to be disturbed, but that their right of occupancy is subject to the restriction. A decree was entered pursuant to such holdings.

Plaintiffs claim that there is a restriction, both of record and by common and general plan, known to all owners and purchasers upon all property in the subdivision that "no lot shall be used or occupied by any person other than of the Caucasian race;" that purchasers were induced to buy and did buy in the subdivision because it was subject to such restriction; and that the Marshalls had actual knowledge of such restriction when they purchased the lot in question.

The record sustains the following facts: that when the plat was recorded in 1916, it largely consisted of farm lands; that the claimed restrictions appear in the conveyances of 13 lots located in the subdivision; that 512 deeds conveying one or more lots from the common grantor contain no race restriction; that lot No. 487, involved in this litigation, was conveyed by warranty deed, dated June 12, 1924, from Robert and Mamie Oakman to Joshua Karbal and contains no race restriction; that the first restriction appearing in a deed was in 1926 or approximately two years subsequent to the sale of the lot in question to Karbal; and that thereafter salesmen employed by the common grantor advised purchasers of the racial restriction; that the Marshalls had no constructive notice of the restriction when they purchased the vendees' interest in the land contract covering the lot in question.

The general rule is that restrictions on the use of land will be construed strictly against those claiming to enforce them and all doubts resolved in favor of the free use of the property. See *Kathan* v. *Steven-*

*son,* 307 Mich. 485. Moreover, the burden of proof of establishing restrictions rests upon the party seeking to establish the same. See *Grant* v. *Craigie,* 292 Mich. 658.

Plaintiffs claim that there was a general plan known to all owners and purchasers that lots in the subdivision would not be used or occupied by any person other than of the Caucasian race. Where there is no express restriction in the chain of title of the particular lot, the use of which is sought to be restricted, there must be proof of a "scheme of restrictions" originating from a common owner. *Williams* v. *Lawson,* 188 Mich. 88. The general plan must have been maintained from its inception and understood, accepted, relied on, and acted upon by all in interest. *Allen* v. *City of Detroit,* 167 Mich. 464 (36 L. R. A. [N. S.] 890).

In the case at bar the subdivision was platted in 1916, but the scheme to restrict sales to people of the Caucasian race did not crystalize until 1926 when salesmen were instructed to confine sales of lots to members of the Caucasian race. The record shows that the lot in question was originally sold to Joshua Karbal in June, 1924; that it was later sold by the Metropolitan Life Insurance Company to Silas Silvers and wife on a land contract dated June 13, 1942, and on August 12, 1942, was sold by Silvers and wife to Marshall and wife. In *Sanborn* v. *McLean,* 233 Mich. 227 (60 A. L. R. 1212), in discussing the question of scheme of restrictions, we said: "Such a scheme of restrictions must start with a common owner; it cannot arise and fasten upon one lot by reason of other lot owners conforming to a general plan." There is evidence in the record that verbal assurances were given to prospective purchasers that the subdivision was subject to racial restrictions.

In *Kathan* v. *Stevenson, supra*, 489, we said:

"The verbal assurance by the seller to some purchasers of lots to exclude colored persons imposed no restriction on the lots so sold and, therefore, lacked the essential element of a reciprocal negative easement upon the lots thereafter sold."

In the case at bar there is no evidence that at the time of sale to Joshua Karbal in 1924, there was anything in the plat as recorded or any conveyance previously made by the common grantor or condition of the subdivision itself that would impress the deed to lot No. 487 with restrictions other than those embodied in it.

In *Casterton* v. *Plotkin,* 188 Mich. 333, we said:

"Manifestly no subsequent conveyances or acts of Mary Gamble (common grantor) or others to which defendant or his predecessors in title were not parties and in privity could affect his title or change the restrictions imposed on lot 66."

The record is void of any evidence that defendants' predecessors in title recognized in their conveyances any race restrictions or entered into any agreement regarding the same of which defendants had actual or constructive notice.

It is claimed that defendants Marshall had actual notice that the subdivision was covered by a race restriction. The written assignment of the contract in which defendants are vendees states: "Subject to any restrictions upon the use of the same and a balance owing upon said contract of $5,865 with interest from June 13, 1942, which the said assignee and grantee assumes and agrees to pay."

There is no evidence that defendants knew of the so-called plan of race restriction when they purchased the property in 1942.

We think the case is controlled by what we held in *Casterton* v. *Plotkin, supra:*

"Can it be said that what he saw or was told operated as legal notice that all this subdivision, or even every lot fronting on Tennyson avenue, including 66, lying against Oakland, was restricted to a single dwelling? Though told by the agent of the premises that this lot, located along a business street, was unrestricted, he obtained an abstract and consulted counsel before closing the deal. Finding it restricted to residence purposes only, he was content to purchase and to comply with the restrictions as disclosed by his abstract. The rule of restrictions resting in parol as to certain lots in a subdivision under a general plan, developed and consistently maintained, has not yet been carried in its application to previously acquired titles not so restrained, held by nonparticipants and their grantees who are strangers to the plan with antedating rights."

The decree of the trial court is reversed, with costs to defendants.

BUSHNELL, C. J., and BOYLES, REID, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.